IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BROOKS GOPLIN,
Individually and on behalf
Of all others similarly situated,

      Plaintiff,

v.                          Case No. 17-cv-773

WECONNECT, INC.,

      Defendant.

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR CONDITIONAL CLASS CERTIFICATION AND
COURT AUTHORIZED- NOTICE**

Plaintiff, Brooks Goplin ("Goplin") has moved for conditional certification of a collective action to pursue his claims against WeConnect, Inc. ("WeConnect"), and others who he purports are similarly situated under the Fair Labor Standards Act ("FLSA").  In particular, and as provided in his proposed notice, Goplin seeks to conditionally certify a class of "all home entertainment specialists and/or field service technicians employed by WeConnect and/or AEI at any time since March 6, 2015" for unpaid "overtime wages to HES employees by not paying them for work performed before arriving at the first customer site or after leaving the last customer site of the workday." (Dkt. #46-6; Dkt. #45 at 1). Goplin's motion should be denied for the reasons set forth below.

## FACTS

WeConnect, among other things, employs home entertainment specialists to install and repair satellite dish systems and related equipment in Wisconsin and Michigan.  (Simon Decl. ¶

2).  In the past, home entertainment specialists were known as field service technicians or

technicians.[1]  (Pollock Decl. ¶5).  Prior to August 18, 2016, WeConnect was known as

Alternative Entertainment, Inc.  (Hoppock Decl. ¶ 2; Pollock Decl. ¶ 1; Dkt. # 27, Murphy Decl.

¶¶ 3-7, Exs. A-C; Dkt. # 28, Libby Decl. ¶¶ 8-9; Dkt. #29, 2nd LeCloux Decl. ¶ 2).  In August

2016, Alternative Entertainment, Inc. changed its name to WeConnect, Inc. (*Id*.)

## A.    WeConnect Territories

WeConnect maintains five locations to service Wisconsin customers in specific

territories: Green Bay, Crystal Falls, Hawthorne, Stevens Point, and Chippewa Falls.  (Simon

Decl. ¶ 3; Pollock Decl. ¶ 3; Zachary Oquist Depo. at 27:13-28:11).  Prior to 2018, WeConnect

also maintained a location office in Madison, but decided to close that office and therefore no

longer employs individuals in that territory.  (Goehre Decl. ¶ 9, Ex. 6).  WeConnect currently

maintains locations in four territories in Michigan. (Pollock Decl. ¶ 4).  Each technician works

out of a specific office or location and in the specific territory where that office is located.

(Simon Decl. ¶ 3; Oquist Depo. at 26:17-28:18; Dustin Bobb Depo. at 38:7-20; Brooks Goplin

Depo. at 32:7-11, 41:4-42:8).  Each territory has a different Field Service Manager ("FSM") and

each technician reports to their territory FSM. (Simon Decl. ¶ 4; Pollock ¶ 5).

## B.    Hourly Pay v. Unit Pay

While some technicians are paid hourly, most technicians are paid on a unit based system

known as the Unit and Supplemental Compensation Plan ("Unit Pay"). (Pollock Decl. ¶ 6; Dkt.

#50, Pollock Depo. at 80:6-22; Goplin Depo. at 30:24-31:3; Oquist Depo. at 22:1-9).  For those

receiving Unit Pay, the technician receives "units" for each job or code, which, in turn,

determines what compensation they are to receive per unit. (Pollock Decl. ¶¶ 6-9, Ex. 1; Dkt.

---

[1] For purposes of this brief, the term technician, field service technician, HES, and home entertainment specialist are
used interchangeably.

#50, Pollock Depo. at 86:6-87:18; Pieper Decl. ¶¶ 7-11).  Every work order has a base set of service activities (which include appointment, customer education, and site survey) and additional work is then added to these base units (e.g., service call, upgrade, new connect, Hughes install, etc.). (*Id.*).  Unit pay is also based upon specific performance measures referred to as "metrics" where certain incentives and/or goals are identified and communicated.  (*Id.*).  Each job may have different units or service activities.  (*Id.*).  Regardless of the jobs on a given day, a technician receiving Unit Pay receives at least minimum wage for all hours worked on any given workday, including travel during the workday. (*Id.*; Simon Decl. ¶ 13; Parker Decl. ¶¶ 15-16).

**C.      Clock-In and Clock-Out Procedures**

There are several policies that direct technicians to record all hours worked including, but not limited to, the employee handbook, the Pixsys Web Clock – Job Type List, and the Time Clock Policy. (Dkt. #46-5 at 14; Dkt. # 46-4 at 2-5).  Technicians are required to record all hours worked.  (*Id.*; Dkt. # 50, Pollock Depo. at 87:25-89:11, 98:9-10; Oquist Depo. at 56:2-17; Parker Decl. ¶¶ 15-17; Simon Decl. ¶¶13-14; Pollock Decl. ¶ 9).  For those who opt to keep their company-owned van at their personal residence, either the night before or in the morning prior to departing for the first customer location, the technician must utilize their company tablet or phone application to log on to the company Oracle Field Service Cloud System ("OFSC"). (Dkt. # 50, Pollock Depo. at 83:23-84:24, 109:10-18). The process of logging into the OFSC generally takes a few seconds and is concluded by clicking a link. (Parker Decl. ¶ 14; Oquist Depo. at 61:23-62:16; Goplin Depo. at 74:4-75:7, 76:24-77:3).  After activating, the technician receives a list of jobs for the day, generally three to six, and drives to the first customer location.  (Parker

Decl. ¶ 14; Oquist Depo. at 62:21-63:6).  Technicians are not allowed to arrive at the first

customer location before 8:00 a.m. (Oquist Depo. at 63:11-14; Goplin Depo. at 108:22-25).

If a technician starts his or her day at a customer location, the technician must clock into

the mobile application referred to as "Comet" (previously referred to as Pixsys) before the

commencement of any work. (Oquist Depo. at 56:18-57:22; Dkt. #46-5 at 14; Dkt. # 46-4 at 2-

5).  Comet tracks the technician's hours worked throughout the entire workday. (Dkt. #50,

Pollock Depo. at 82:5-13, 87:22-89:15).  As testified to by Opt-In Claimant Zachary Oquist, and

consistent with company policies noted above, on days in which the technician travels to his

territory office before going to a customer location, the technician is required to clock in upon

arrival at the office.  (Dkt. #46-5 at 14; Dkt. # 46-4 at 2-5; Oquist Depo. at 59:6-60:6, 72:25-

74:24)  For example, if the technician had a mandatory meeting or needed to restock his van

with inventory, he or she would clock in upon arrival at the territory office. (*Id*.; Simon Decl. ¶¶

13-14; Pieper Decl. ¶¶ 10-11). Technicians are informed during their initial training, and as

provided in the Handbook and Time Clock Policy, of this companywide requirement to clock in

whenever you start work—regardless of whether they are paid hourly or receive Unit Pay.

(Goplin Depo. at 61:18-62:17; Goehre Decl. ¶ 10, Ex. 7 at 14; Dkt. #46-5 at 14; Dkt. # 46-4 at 2-

5 ("On days that include traveling to the location office prior to his/her first job (weekly

meetings, up-training, audit, etc.) the employees start time will be when the office activity begins

. . . . not upon the arrival of the first job."))[2]

At the end of the workday and after completing all work for the day, the technician then

clocks out of Comet.  (Goehre Decl. ¶ 10, Ex. 7 at 14; Dkt. #46-5 at 14; Dkt. # 46-4 at 2-5).  If

the technician has to return to his or her territory office "after completion of his/her last job, for

---

[2] Oquist also admitted that it is possible that he submitted fraudulent time records by clocking in earlier than he
actually started work on certain workdays. (Oquist Depo. at 70:2-12).

4

example an audit, the technician will clock out via the mobile application on his/her tablet once

the activity/working day has been completed." (Dkt. # 46-4 at 4; Simon Decl. ¶¶ 13-14; Pieper

Decl. ¶ 8; Parker Decl. ¶ 10).

**D.    Correcting Time Card Errors**

Technicians are also instructed on what to do if they are unable to clock in or out, or if

there is an error in their time records.  (Goehre Decl. ¶ 10, Ex. 7 at 14; Dkt. #46-5 at 14; Dkt. #

46-4 at 2-5; Pollock Decl. ¶ 6, Ex. 1; Parker Decl. ¶ 13; Goplin Depo. at 93:6-94:10, 96:23-

97:23, 102:16-103:22; Oquist Depo. at 57:18-58:25).  For example, in the event that the

technician is unable to clock in or out for some reason (*e.g.,* no service or forgot to clock in), the

Time Clock Policy instructs the technician to "contact their location to be clocked in/out."  (Dkt.

#46-4 at 4).  Likewise, if the technician was unable to take a lunch, they are trained to notify

their territory manager so that their time is properly added. (*Id*.).   For example, Goplin testified

that he was aware of the process to add time to or correct time cards and, furthermore, he utilized

that process "every time" he had such an issue. (Goplin Depo. at 93:6-94:10, 96:23-97:23).

Oquist testified that he was aware of the policy and had to modify his time records when he

didn't take a lunch on a given day or when he didn't have service in an area, he would simply

contact his FSM. (Oquist Depo. at 70:24-74:24).

Second, technicians are required to carefully review and accept their time records before

submission. (Goehre Decl. ¶ 10, Ex. 7 at 14; Dkt. #46-5 at 14; Dkt. # 46-4 at 5).  Technicians are

required to authorize their timesheet by each Thursday morning for the previous week including

verification of "clock in/out times for each day" and "verify job type for each day." (Dkt. # 46-4

at 5).

Third, if there are any questions or disputes after receiving a paycheck, the technician must inform his or her supervisor as soon as it is discovered so "that it can be quickly corrected." (Goehre Decl. ¶ 10, Ex. 7 at 15; Dkt. #46-5 at 15; Dkt. # 46-4 at 4).  Thereafter, the technician can bring any further dispute to the attention of payroll. (Pollock Decl. ¶ 6, Ex. 1 at 4).  In some cases, the technician's FSM may contact him or her directly to reconcile an error in a time record. (Parker Decl. ¶¶ 11-12).

## E.     Storage of Equipment

Technician's travel to customer's homes to install and repair satellite dishes using company-owned and provided vehicles. (Bobb Depo. at 25:17-26:3; Goplin Depo. at 44:5-46:18; Oquist Depo. at 34:6-36:21; Goehre Decl. ¶¶ 4-6, Exs. 1-3).  Technicians are provided with a utility van with ample space to store and maintain company equipment (i.e., dish satellites, receivers, and other products for customers). (*Id*.).  In addition, technicians are instructed and trained to return to their territory office to restock their vans as needed to ensure that they have ample equipment for a given work week. (Dkt. #50, Pollock Depo. at 69:9-15; Goplin Depo. at 40:13-20, 53:12-20; Oquist Depo. at 43:8-25 ("And everybody had a specific day that they were supposed to be picking up the equipment.")  There are absolutely no restrictions or limitations on how often a technician can return to the territory office to restock on equipment and inventory. (Simon Decl. ¶ 9; Goplin Depo. at 40:13-20, 53:12-20; Oquist Depo. at 47:6-14).

Depending on the territory, technicians will generally have routine weekly and monthly meetings, routine monthly audits of inventory, and other trainings that technicians can use to restock their vans. (*Id*.; Pieper Decl. ¶ 6; Dkt. #50, Pollock Depo. at 23:4-10).  In addition, depending on whether the technician is classified as "local" or "remote" may bear on how often a technician comes to the territory office to restock on inventory.  (Simon Decl. ¶ 11; Oquist Depo.

6

at 31:6-34:24, 36:2-11; Goehre Decl. ¶ 4, Ex. 1 (describing the difference between local and rural)). For example, local technicians routinely arrive at the territory office to restock their vans as needed for jobs. (Oquist Depo. at 31:1-25, 40:4, 43:8-17, 46:15-25, 47:1-17).  However, rural technicians may stock more inventory and equipment in their vans so that they do not drive back as often to the territory office. (Simon Decl. ¶ 11).

Regardless of whether a local technician or a rural technician, the company maintains a policy requiring that equipment be stored in the company-owned vehicle.  (Simon Decl. ¶¶ 5-8; Parker Decl. ¶¶3-9; Pieper Decl. ¶¶ 4-6; Oquist Depo. at 43:15-25).  Goplin, Oquist and Bobb were all aware of the company policy during their employment and that it meant that they were not to store equipment in their homes. (Oquist Depo. at 43:15-25; Goplin Depo. at 44:5-49:21; Bobb Depo. at 65:22-68:25; Goehre Decl. ¶¶ 4-6, Exs. 1-3). As stated in the Vehicle Use Agreement, which was signed by each technician, including Goplin and the Opt-in Claimants, at the time they were provided with the company-owned vehicle:

> All company equipment should remain in the vehicle at all times. The vehicle should be parked at the technician's residence in a well lighted area.  The company vehicle is to be locked at all times.

Goehre Decl. ¶¶ 4-6, Exs. 1-3 at 1).

## F.    Tools

Technicians were given the opportunity to purchase tools that they could, in part, use to perform their duties.  (Simon Decl. ¶ 15; Goplin Depo. at 118:8-24, 121:20-122:4; Oquist Depo. at 51:25-53:16; Goehre Decl. ¶ 8, Ex. 5).  If the technician purchased the tools, they were not restricted from using the tools for non-work related uses. (*Id*.).  Most technicians agreed to purchase the tools through periodic, automatic deductions and upon signing a written agreement

providing for the same. (*Id.*).  WeConnect reserved the right to buy back any tools at the end of employment, but was not required to do so. (*Id.*).

Some of the tools purchased by technicians were rechargeable, such as drills.  (Simon Decl. ¶¶ 17-18; Parker Decl. ¶¶ 18-20).  Depending on the territory, some technicians were provided with car adaptors to charge tools in their vehicles. (*Id.*).  Others may have simply charged and used their tools at their homes since they owned the tools. (*Id.*).  WeConnect does not require technicians to charge tools at any certain time, but rather they may do so at their convenience.  (*Id.*).  The process of charging these rechargeable tools is as simple as plugging them into a wall outlet or docking station (which is already plugged into a wall outlet).  (*Id.*; Goplin Depo. at 115:20-117:12).

## G.   Arbitration Agreements

All technicians have signed an Open Door Policy and Arbitration Program Agreement, also referred to as an "Arbitration Agreement," since 2013.  (Hoppock Decl. ¶¶ 2-4). There have been three different versions of the Arbitration Agreement. (*Id.* ¶5). However, all versions provided for arbitration of wage and hour claims and, among other things, waiver of class and collective actions. (*Id.*)  In particular, the following summarizes the various Arbitration Agreements that are impacted by Plaintiff's Motion for Conditional Class Certification:

(1)   *Arbitration Agreement #1*: Goplin and the Opt-In Claimants (Bobb, Oquist, and Milz) have signed this version.  (*Id.* ¶ 6, Ex. 1).  Unlike Goplin, however, many technicians signed Arbitration Agreement #1 prior to the name change of Alternative Entertainment, Inc. to WeConnect, Inc.[3] (*Id.* ¶ 7).  From February 2013 through October 2017, approximately 796

---

[3] As a result, the Court's prior ruling does not relate to those employees who were hired prior to the name change and signed Arbitration Agreement #1.  To the extent that the Court grants Plaintiff's Motion for Conditional Class Certification, in whole or in part, WeConnect has opted to arbitrate those claims and has filed a separate Motion to Compel Arbitration of Putative Class Members' Claims.

technicians signed Arbitration Agreement #1. (*Id*.)  The vast majority of the technicians who signed Arbitration Agreement #1 signed that agreement prior to the name change in August 2016 and the vast majority of these were countersigned by the company. (*Id*. ¶¶ 7 and 12).

(2)   *Arbitration Agreement #2*: From November 2017 to late June 2018, WeConnect utilized an updated version of the Arbitration Agreement. (Hoppock Decl. ¶ 8, Ex. 2). Arbitration Agreement #2 provided for, among other things, arbitration of technician's wage and hour claims, and waiver of any right to class or collective action.  (*Id*.).  Approximately 145 technicians signed Arbitration Agreement #2. (*Id*. ¶ 9). All of these agreements were countersigned by the company. (*Id*. ¶ 12)

(3)   *Arbitration Agreement #3*:  From approximately late June 2018 to the present, WeConnect utilized an updated version of the Arbitration Agreement. (*Id*. ¶ 10, Ex. 3).  Like the prior versions, Arbitration Agreement #3 provided for, among other things, arbitration of technician's wage and hour claims, and waiver of any right to class or collective action.  (*Id*.). Approximately 210 technicians signed Arbitration Agreement #3. (*Id*. ¶ 11). All of these agreements were countersigned by the company. (*Id*. ¶ 12)

## H.   Goplin's Employment

Goplin began his employment with WeConnect in February 2017 as a technician. (Goplin Depo. at 24:2-13). Goplin was a rural remote technician—as opposed to local remote. (Goehre Decl. ¶ 4, Ex. 1 at 3).  Other than a few days of initial training, Goplin only worked out of WeConnect's Madison office and in the Madison territory from hire until his last day of employment on August 27, 2017. (Goplin Depo. at 32:7-11, 41:4-42:8).  Likewise, Zachary Oquist and Dustin Bobb (other technicians who filed declarations in support of Goplin's Motion)

also worked out of the Madison office and in the Madison territory while employed for

WeConnect, but no other locations. (Oquist Dep. at 26:17-28:18; Bobb Dep. at 38:7-20).

At all times during his employment, Goplin received an hourly wage rate. (Goplin Depo.

at 26:11-27:12, 30:24:24-25:19).  Goplin was never on or received Unit Pay. (*Id*.).  Goplin's day-

to-day work activities were directed and supervised by his Madison FSM. (*Id*. at 36:17-37:12)

Goplin indicated that he could travel to the Madison warehouse to pick up equipment

anytime he wanted to and he did not believe he had a set day to come in to restock on equipment.

(Goplin Depo. at 37:9-12, 40:4-20).  Goplin testified that he was aware of the companywide

policy requiring that he store his equipment in his van and prohibiting storage of equipment in

his home. (Goplin Depo. at 49:7-55:13).  However, he contends that his Madison FSM allowed

him to store equipment in his home.  (*Id*.).  Goplin testified that he knows of three other Madison

technicians that stored equipment at their home, but cannot say if anybody else did. (*Id*. at 39:10-

18, 50:16-51:3).

Goplin testified that he was required to activate through OFSC by 6:30 a.m., which he

could do lying in bed since it only required clicking a button. (Goplin Depo. at 74:4-75:7, 76:24-

77:3).  Goplin was aware that the company maintained a policy requiring technicians to record

all hours worked. (*Id*. at 63:23-64:13, 68:2-69:3, 91:4-94:18).  Goplin claimed that he would

typically stock his van with equipment he stored at his home every morning, despite the

companywide policy to the contrary, and head to the first customer location.  (*Id*. at 75:12-76:5).

Goplin also testified that he would unload equipment from his van at the end of the workday

despite the companywide policy to the contrary.  (*Id*. at 112:7-113:6).  However, Goplin testified

that "every day" he would drop his daughters off at daycare after he loaded his van, but before he

drove to the first customer location. (Goplin Depo. at 130:1-132:3).  Likewise, at the end of the

day, he would drop his van off at his home, then go to pick up his daughters from daycare before

unloading his van. (*Id*.).  Goplin would use his personal vehicle to drive to and from the daycare

each day. (*Id*.)  This was the reason Goplin provided to WeConnect for resigning his

employment. (Goplin Depo. at 132:12-133:24; Goehre Decl. ¶ 7, Ex. 4).

**STANDARD**

Section 216(b) of the FLSA authorizes employees to bring collective actions to recover

unpaid overtime compensation on behalf of themselves and "other employees similarly

situated." 29 U.S.C. § 216(b). There is a two-step process for class certification under the FLSA.

*Espenscheid v. DirectSat USA, LLC,* 2010 WL 2330309, *6 (W.D.Wis. June, 7, 2010); *Kelly v.

Bluegreen Corp.,* 256 F.R.D. 626, 628–89 (W.D.Wis.2009). At the first step, plaintiffs must

make "a modest factual showing" that they are similarly situated to potential class members and

that they and potential class members were "victims of a common policy or plan that violated the

law." *Kelly*, 256 F.R.D. at 629–30. If this showing is made, the court conditionally certifies a

class and authorizes notice to potential class members. *Austin v. CUNA Mutual Insurance

Society,* 232 F.R.D. 601, 605 (W.D.Wis.2006). The second step occurs at the close of discovery

upon a motion for decertification from the defendant. At that point the court determines whether

the plaintiffs are in fact similarly situated to those who have opted in. *Id*.

In this case, the parties have conducted significant discovery. (Goehre Decl. ¶¶ 2-3).

When the parties have conducted significant discovery, the usual "modest factual showing" is

supplanted by more scrutiny than would normally be applied at the conditional certification

phase. *Boelk v. AT & T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 261265, at *14 (W.D.

Wis. Jan. 10, 2013); *Hawkins v. Alorica, Inc.*, Case No. 2:11–CV–00283–JMS,2012 WL

4391095 (S.D.Ind. Sept. 25, 2012) (applying "intermediate level of scrutiny" to conditional

11

certification where substantial discovery had been conducted, but was not yet complete); *Scott v. NOW Courier, Inc.,* Case No. 1:10–CV–971–SEB–TAB, 2012 WL 1072751 (S.D.Ind. Mar. 29, 2012) (same); *Purdham v. Fairfax County Public Schools,* 629 F.Supp.2d 544, 547 (E.D.Va.2009) (if court can determine at condition certification stage that notice is not appropriate, court can "collapse the two stages of the analysis and deny certification outright").

## ARGUMENT

I.   **THERE IS NO EVIDENCE OF ANY COMPANYWIDE POLICY IN VIOLATION OF THE LAW THAT RESULTED IN COMMON INJURIES AND GOPLIN'S ALLEGATIONS STEM FROM HIS ACTIONS IN VIOLATION OF A COMPANYWIDE POLICY.**

   a.   **There is No Evidence of a Companywide Policy Regarding the Storage of Equipment at Home and Failing to Pay Wages Related to Storing Equipment at Home.**

Goplin fails to establish that he and putative members are victims of a *common* policy or plan, or one that *violated the law*. As a preliminary matter, to the extent that Goplin contends that WeConnect had a policy in violation of the law that failed to compensate technicians for the act of checking in or out of its systems, that alone would not violate the law and there is no evidence of any such policy in violation of the law.  "[A]ctivities such as checking in and out and waiting in line to do so would not ordinarily be regarded as integral parts of the principal activity or activities." 29 C.F.R. § 785.24; *see also* 29 C.F.R. § 785.47.  Furthermore, regardless of what activities may have occurred at home, "[n]ormal travel from home to work is not worktime." 29 C.F.R. § 785.35.  Likewise, activities that are incidental to the use of an employer's vehicle for commuting are not considered principal activities when the use of such vehicle is within the normal commuting area for the employer's business . . . and subject to an agreement." 29 C.F.R. § 785.34 (Goehre Decl. ¶¶ 4-6, Exs. 1-3).   As a result, the time spent clocking in or out and

12

drive time to or from work are not compensable and, therefore, no class should be certified as it relates to those allegations.

Goplin's principal argument is that all putative class members are subject to the same company-wide policy of requiring technicians to perform work at home, which flows from an alleged requirement for technicians to store equipment at home.  As a result, Goplin contends that such time spent loading and unloading the equipment he stored at his home and the drive time to the first customer location and the drive time from the last customer location should also be compensated. (Dkt. #45 at 16).  However, the alleged storage of equipment directive is not at all common and, in any event, the actual companywide policy does not violate the law.

Goplin, Oquist and Bobb all worked in Madison and did not work in any other WeConnect territories or locations.  (Goplin Depo. at 32:7-11, 41:4-42:8; Oquist Dep. at 26:17-28:18; Bobb Dep. at 38:7-20).  Goplin, as well as Oquist and Bobb, all testified that the companywide policy actually indicated that "[a]ll company equipment should remain in the vehicle at all times" and, as a result, the policy was that no equipment should be stored in, among other places, a personal residence or home. (Oquist Depo. at 43:15-25; Goplin Depo. at 44:5-55:13; Bobb Depo. at 65:22-68:25; Goehre Decl. ¶ 4-6, Exs. 1-3).

Goplin claims to the contrary that certain FSMs in Madison allowed him to store equipment in his home.  (Goplin Depo. at 49:11-17 ("I complied with whatever my FSMs told me to do, which would be going against that policy.")  However, there is no companywide policy requiring or allowing storage of equipment at home and no companywide policy of not paying for related work at home.  Alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a companywide policy or plan are not appropriate for collective treatment.  *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *7

(E.D. Wis. Sept. 11, 2008)(plaintiffs statements did not provide factual support that company was aware of and permitted off-hour work without pay on a widespread basis).

Rather, the actual companywide policies are directly contrary to Goplin's allegations. (Goehre Decl. ¶¶ 4-6, 10, Exs. 1-3, 7; Dkt. # 46-5 at 14 (WeConnect Handbook); Dkt. #46-4 at 2-3 (Pixsys Web Clock – Job Type List); Dkt. #46-4 at 4-5 (Time Clock Policy)).  While Goplin and Opt-In claimants testified that certain Madison supervisors may have allowed or known that they stored equipment in their homes—which they contend required necessary loading and unloading time—that is too individualized and does not establish a common policy. *See Hadley v. Journal Broadcast Group, Inc.,* No. 11-c-147, 2012 WL 523752, at *4 (E.D. Wis. Feb. 16, 2012) ("each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach.")

### b.  Goplin Has Failed to Provide Any Evidence that He is Similarly Situated to Any Technician that Worked Outside of the Madison Territory or Location.

Goplin alleges that unofficial practices of Madison FSMs resulted in violations of the law. However, Goplin has neither alleged nor provided any evidence of such practices or violations in any other territories or at any other locations (other than Madison).  Goplin, Oquist, and Bobb all worked in the Madison territory and from the Madison office. (Goplin Depo. at 32:7-11, 41:4-42:8; Oquist Dep. at 26:17-28:18; Bobb Dep. at 38:7-20). There is no supporting evidence to suggest any policy or violation outside of the Madison territory.  In fact, the only evidence is that the company maintained various policies that are contrary to the Goplin's "Madison-specific" allegations, such as instructing the following:

- keep "[a]ll company equipment . . . in the vehicle at all times";

- record "[a]ll hours worked" and "submit work hours on a daily basis";

14

- "carefully and accurately" prepare and accept time records, which "attests to the hours worked";

- "clock in via Pixsys application on their tablet at the start of their shift" and "clock out via the Pixsys application on their tablet at the end of their shift";

- again, when reporting to "the office the employee will clock in via Pixsys" and "at the end of the shift the employee will clock out via Pixsys";

- when a "technician is traveling from one location to another location during business hours, they need to be clocked in under the Travel job type";

- if the technician is unable to clock in or out or the tablet is "offline, the technician will need to contact their location to be clocked in/out in real time via the Web Clock";

- if the technician works during a lunch break, technicians must "notify [their] manager so that [their] time can be added."; and

- for meetings, the "employee will clock in under the Meeting job type."

(Decl. Pollock ¶ 6, Ex. 1 (Unit and Supplemental Compensation Plan); Goehre Decl. ¶¶ 4-6, 10, Exs. 1-3, 7; Dkt. # 46-5 at 14 (WeConnect Handbook); Dkt. #46-4 at 2-3 (Pixsys Web Clock – Job Type List); Dkt. #46-4 at 4-5 (Time Clock Policy)).

The evidence provided by Goplin, even if accepted as true, establishes that only Madison technicians may have been subject to an unofficial policy or practice that depends on whether the technician was rural or local, the technician's personal preferences concerning storing and restocking equipment, the technician's route for a given day, and the particular FSM involved. Such fact-specific inquiries would make a class or collective action unmanageable. See *Boelk*, 2013 WL 261265 at 13-15.

Furthermore, neither Goplin nor the Opt-In Claimants submitted any evidence of a factual nexus between their alleged experience and the experiences of those technicians in other territories or out of locations other than Madison, Wisconsin. *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *6 (E.D. Wis. Sept. 11, 2008)("Conclusory allegations . . . are simply not sufficient to make even the modest factual showing required.") *See Mata v. Foodbridge LLC*, No. 14 CIV. 8754 ER, 2015 WL 3457293, at *2 (S.D.N.Y. June 1, 2015)(To meet the "modest factual showing" a "Plaintiff must offer 'actual evidence of a factual nexus' between his own experience and the experiences of those he claims as 'similarly situated,' rather than 'mere conclusory allegations.'")  The contention that FSMs were aware that Goplin or others were storing equipment at home and not getting paid for time spent loading/unloading their vans are inadmissible since Goplin has no knowledge of their mental state and, regardless, "would not merit conditional certification" regarding other locations. *Adair,* 2008 WL 4224360 at 8; 29 C.F.R. § 785.12 (employer must either know or have reason to believe that the work away from the premises or job site is being performed).

Goplin, Bobb and Oquist all testified that they did not work in any other territory except for the Madison territory. (Goplin Depo. at 32:7-11, 41:4-42:8; Oquist Dep. at 26:17-28:18; Bobb Dep. at 38:7-20).  As a result, there is no basis to impose a companywide conditional certification of a class and Goplin has failed to make the requisite modest factual showing in that regard. *See Anjum v. J.C. Penney Co., Inc.,* 2015 WL 3603973 at 8-9 (E.D.N.Y. June 5, 2015)(denying statewide conditional certification when only evidence related to store in Staten Island, New York and plaintiffs "belief" that others were subject to the same or similar policies).

## II.   GOPLIN FAILED TO MEET HIS BURDEN TO SHOW THAT HE IS SIMILARLY SITUATED TO THE PROPOSED CLASS FOR A VARIETY OF ADDITIONAL REASONS.

Although not indicated in Goplin's and the Opt-In Claimant's declarations (Dkt. #47-49, their sworn testimony shows that there are significant differences between Goplin and the putative class that will overwhelm the collective action and, furthermore, cause too individualized of an assessment to warrant conditional certification.

> ### a. Goplin Was Paid Hourly As Opposed to the Vast Majority of Other Technicians Who Received Unit Pay.

As testified to by Goplin, he was an hourly technician at all times during his employment with WeConnect.  (Goplin Depo. at 26:11-27:12, 30:24:24-25:19).  Meaning he was paid for all hours worked using a base hourly rate from the moment he clocked in until the moment he clocked out—which is different from Unit Pay that Dustin Bobb and Zachary Oquist received for most of the duration of their employment.  (Bobb Depo. at 34:10-25; Oquist Depo. at 23:1-12).  As a result of only receiving an hourly rate, Goplin has no knowledge of the Unit Pay Plan, which is the compensation regimen that the vast majority of other technicians received. (Pollock Decl. ¶ 6).

In order to be considered "similar" to the putative members, Goplin must establish that the other technicians have similar pay provisions. *Bunyan v. Spectrum Brands, Inc.,* 2008 WL 2959932 at 5 (S.D. Ill. July 31, 2008)(The modest factual showing "does require at least some minimal support for Plaintiffs' allegation that they . . . are similarly situated in their job duties and their compensation plan."); *see also Morgan v. Family Dollar,* 551 F.3d 1233, 1259-60 (11th Cir. 2008).  Goplin failed to offer any evidence that he was paid in a similar manner as the other technicians and, rather, the evidence establishes he was paid differently than most other technicians. (Goplin Depo. at 26:11-27:12, 30:24:24-25:19; Pollock Decl. ¶ 6; Bobb Depo. at 34:10-25; Oquist Depo. at 23:1-12). Moreover, resolution of different legal issues are presented

between the two compensation methods of an hourly worker and a unit or piece-rate worker. 29 C.F.R. § 778.110 and 111.

> **b.  Goplin Was a "Rural" Technician—As Opposed to "Local" Technicians—With  Significantly Different Daily Routes As a Result.**

Goplin was always classified as a "rural" technician as opposed to a "local" technician. (Goehre Decl. ¶4, Ex. 1 at 3).  Rural technicians generally resided 60 or more miles away from their territory office and often times, as a result, opted not to restock vans at the territory office as frequently as local technicians.  (*Id*. at 1; Simon Decl. ¶ 11). Conversely, local technicians residing closer to the territory office frequently drove to the territory office to restock equipment in their vans. (Simon Decl. ¶ 11; Oquist Depo. at 31:6-34:24, 36:2-11; Goehre Decl. ¶ 4, Ex. 1).

In fact, Oquist, who was a local technician, testified that he frequented the Madison territory office to restock equipment in his van—sometimes multiple times per week depending on his schedule.  (Oquist Depo. at 31:1-25, 43:8-17, 47:1-17).  When asked what he would do as a local technician when he ran out of equipment, Oquist replied that "[t]ypically, try to go to make it to the Madison warehouse." (Oquist at 40:4-7).  Oquist, as a local technician, did not need to store equipment in his home or garage since he resided closer to the Madison territory office. (Oquist Depo. at 14:5-10, 23:17-19, 40:4, 46:15-25 (indicating he stored equipment in his garage maybe ten times during the duration of his employment from February 2015 to January 2018)).  Oquist also testified that he was aware that the "company had a policy against keeping equipment" in a technician's home. (Oquist Depo. at 43:15-25; Goehre Decl. ¶ 5, Ex. 2 at 1).  Oquist specified that his start time on days he went to the office first, for example, to pick up inventory or equipment, his start time would be when he arrived at the Madison office—consistent with company policy. (Oquist Depo. at 73:4-14).

Oquist's testimony demonstrates the significant difference between local and rural technicians in relation to the alleged need to store equipment in their homes and their daily activities related to loading or unloading equipment. Since the "crux" of Goplin's claim relates to the alleged need to store equipment in his home and time he thereafter spent loading or unloading his van, he cannot be similarly situated to local technicians since his circumstances, as a rural technician, are dramatically different than that of local technicians.

### c.   Goplin's Declaration Misrepresents His Daily Activities and Omits Material Information Establishing He is Not Similarly Situated.

Goplin contends that he was forced to store equipment at his home, which then required him to load and unload equipment at his home in the morning before leaving for the first customer location and at night after returning for the first customer location—and that his daily routine is similar to all other technicians.  Goplin, however, omitted a substantial fact from his declaration: after Goplin loaded his van in the morning, but before driving from home to the first customer location; and before unloading his van in the evening after driving home from his last customer location, Goplin would drive his personal vehicle to take his daughters to and from daycare every day. (Goplin Depo. at 130:1-132:3).

As a result, even if we assume that normal travel from home to work would be compensable for the sake of argument, Goplin's contention that his travel time from home to the first customer location and from the last customer location to his home is not "all in a day's work." Rather, it is demonstrably cut-off from any alleged work time at his home due to his personal errand.  Such periods in which Goplin was unquestionably not on duty and in furtherance of personal purposes are not hours worked. 29 C.F.R. § 785.16(a). As a result, the continuous workday theory that Goplin promotes as his gateway to compensation for travel time from or to his home was dismantled by Goplin's own sworn testimony.  Furthermore, it

19

demonstrates just how dissimilar Goplin's activities are to other putative members and the differing legal issues presented by Goplin's unique daily routine.

### III.   THE POTENTIAL MEMBERS OF THE CLASS HAVE SIGNED ENFORCEABLE ARBTRATION AGREEMENTS AND, AS A RESULT, ARE NOT SIMILARLY SITUATED TO GOPLIN.

Each technician since 2013 has signed one or more Arbitration Agreements requiring arbitration if either the employee or WeConnect opts to arbitrate those claims.  (Hoppock Decl. ¶ 4).  WeConnect seeks to arbitrate these putative claims pursuant to the Federal Arbitration Act— other than Goplin's Arbitration Agreement since the Court held it be unenforceable in relation to the circumstances of Goplin's employment.  (Hoppock Decl. ¶ 13).  However, there are three other large classes of technicians who signed one or more Arbitration Agreements requiring individual arbitration of their wage and hour claims.  (*Id*. ¶¶ 4-5).  Accordingly, each putative member's claims must be arbitrated and this fact weighs heavily against conditional certification.

In particular, the following summarizes the various Arbitration Agreements that are impacted by Plaintiff's Motion for Conditional Class Certification:[4]

(1)   *Arbitration Agreement #1*: The Court has already ruled that Goplin's Arbitration Agreement is not enforceable since it was signed after the name change in August 2016 and Goplin was hired after the name change.  (Dkt. #20).  However, Plaintiff's Motion for Conditional Class Certification impacts other employees who signed that version of the Arbitration Agreement, but were hired prior to the name change (*i.e.,* prior to August 18, 2016). As a result, the Court's prior ruling does not affect those employees who were hired prior to the name change and signed Arbitration Agreement #1.  From February 2013 through October 2017, approximately 796 technicians signed Arbitration Agreement #1. (*Id*.)  The vast majority of the

---

[4] While there have been minor modifications or changes to the Arbitration Agreements over time, generally, there are three main versions of the Arbitration Agreement.

technicians who signed Arbitration Agreement #1 signed that agreement prior to the name change in August 2016 and the vast majority of these were countersigned by the company. (*Id.* ¶¶ 7 and 12).

(2)     *Arbitration Agreement #2:* From November 2017 to late June 2018, WeConnect utilized an updated version of the Arbitration Agreement, which provided for, among other things, arbitration of technician's wage and hour claims, and waiver of any right to class or collective action. (Hoppock Decl. ¶ 8, Ex. 2). Approximately 145 technicians signed Arbitration Agreement #2 and all of these agreements were countersigned by the company. (*Id.* ¶¶ 9, 12)

(3)     *Arbitration Agreement #3*:  From approximately late June 2018 to the present, WeConnect utilized an updated version of the Arbitration Agreement. (*Id.* ¶ 10, Ex. 3). Like the prior versions, Arbitration Agreement #3 provided for, among other things, arbitration of technician's wage and hour claims, and waiver of any right to class or collective action. (*Id.*). Approximately 210 technicians signed Arbitration Agreement #3. (*Id.* ¶ 11). All of these agreements were countersigned by the company. (*Id.* ¶ 12)

The Federal Arbitration Act ("FAA") provides in pertinent part, as follows:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4. Under the FAA, courts must enforce agreements to arbitrate. 9 U.S.C. § 2 (arbitration agreements "shall be valid, irrevocable, and enforceable"); *Dean Witter Reynolds,*

*Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24-25 (1983); *Gore v. Alltel Communications, LLC,* 666 F.3d 1027 (7th Cir. 2012). "If the court is satisfied that the parties have a contract that provides for arbitration of some issues between them, then the Arbitration Act requires it to resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, 'whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability.'" *Mason Cos., v. DAZ Sys., Inc.,* No. 12-cv-547-SLC (W.D. Wis. July 15, 2013) (citations omitted).[5]   The party opposing arbitration bears the burden of proving that the claims at issue are not referable to arbitration. *Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 91-92 (2000).

Conditional Certification should therefore be denied due to the fact that it would require individualized assessment of each technician's Arbitration Agreement and, ultimately, require that the putative members arbitrate those claims. Furthermore, to the extent that the Court grants Plaintiff's Motion for Conditional Class Certification, in whole or in part, WeConnect has opted to arbitrate those claims and has filed a separate Motion to Compel Arbitration of Putative Class Members' Claims.

---

[5] All versions of the Arbitration Agreement require arbitration to take place in Green Bay, Wisconsin.  Because "a district court cannot compel arbitration outside the confines of its district" under Section 4 of the FAA, the proper course when arbitration must take place outside of the district is to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011); *see also Cont'l Cas. Co. v. Am. Nat'l Ins. Co.,* 417 F.3d 727, 733 (7th Cir. 2005).

**IV.  PLAINTIFF SHOULD BE PRECLUDED FROM NOW TAKING THE POSITION THAT ALTERNATIVE ENTERTAINMENT, INC. AND WECONNECT, INC. ARE THE SAME ENTITY.**

Goplin has previously taken the position in this case, despite the clear and uncontroverted evidence to the contrary, that Alternative Entertainment, Inc. is a different company from WeConnect, Inc. for purposes of challenging Goplin's arbitration agreement. However, Goplin now seeks to conditionally certify a class dating back to March 6, 2015—over a year prior to the August 2016 name change—including employees of Alternative Entertainment, Inc. (which could include some ex-employees who never even worked for WeConnect) and using policies of Alternative Entertainment, Inc.  Alternative Entertainment, Inc. is not a party to this lawsuit and Goplin should be precluded from departing from his prior position and representations he made to the court. Judicial estoppel "is an equitable concept designed to protect the integrity of the judicial process and to prevent litigants from playing fast and loose with the courts." *Butler v. Village of Round Lake Police Dept.,* 585 F.3d 1020 1022-23 (7th Cir. 2009)("It's purpose is to prevent a litigant from prevailing twice on opposite theories.")(citations and quotations omitted); Cooper v. Eagle River Mem. Hosp., Inc., 270 F.3d 456, 462 (7th Cir. 2001)(citing *State v. Petty,* 201 Wis.2d 337, 548 N.W.2d 817, 820 (1996)).  As a result, even if the Court grants Goplin's motion, conditional certification is not appropriate for employees of Alternative Entertainment, Inc. and who were employed prior to August 18, 2016. (Dkt. #27 ¶¶3-4).

**V.  NOTICE WILL NOT FACILITATE JUDICIAL ECONOMY.**

District Courts have discretion in determining whether to authorize notice; however, the Portal-to-Portal Act's stated intent to limit employees' ability to proceed collectively is a critical guidepost. *See Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170-71, 73 (1989). (the 1947 FLSA amendments were enacted to "free[ ] employers of the burden of representative actions").

As a result, the fundamental inquiry is whether judicial economy would be promoted by
certifying a class.  In this case, Goplin's morning and evening, or off-the-clock, claims and what
he would need to prove at trial would render a collective action judicially inefficient. *See Boelk*,
2013 WL 261265 at 13-15 (a court should decline certification when fact-specific inquiries
would make a class or collective action unmanageable);  *Xavier v. Belfour USA Group, Inc.,* 585
F. Supp. 2d 873, 877 (E.D. La. 2008) ("Courts require some identifiable facts or legal nexus that
binds the claims so that hearing the cases together promotes judicial efficiency."); *Andersen v.
Wells Fargo Fin., Inc.,* No. 4:11-cv-00085, 2012 U.S. Dist. LEXIS 23175, at *19 (S.D. Iowa
Feb. 6, 2012) (court is "required" to determine whether a collective action would result in an
unmanageable trial).

The Court would have to consider, for each technician, for each day and workweek, what
that technician did in terms of storing equipment at their respective homes in violation of
company policy; the jobs performed by each technician for each day to determine how much
equipment was needed on any given day; the related time spent loading or unloading equipment
into and from a company van to the technician's home; what other alleged off-the-clock work
was performed; whether management was aware or should have been aware of the same; and for
how long such "work" was performed so as to determine whether it would push that individual's
hours to over 40 for the week (and by how much). *See* 29 U.S.C. § 207(a)(1)-(2); see generally
*England v. New Century Fin. Corp.,* 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (assessing
damages would "require a case-by-case inquiry, thereby rendering it impossible to try this case
as a collective class"). Matters of proof become even more difficult when alleged off-the-clock
work takes place away from the office or supervisors. Further, even if off-the-clock work were

found to have taken place, and there is a basis for liability, time spent on the activities at issue might be administratively burdensome to record and de minimis as noted above.

This case would not promote judicial economy to resolve Plaintiff's claims in one proceeding. Rather, "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated" or are subject to mandatory arbitration. *Adair*, 2008 WL 4224360, at *4 (citations and quotations omitted) (also explaining the Seventh Circuit's observation that discovery following conditional certification may impose a "tremendous financial burden to the employer") (citations omitted); *Hadley*, 2012 WL 523752, at *4 ("[T]o the extent the allegation is that the company had a policy requiring employees to work without pay, the allegations are so individualized that there would not likely be any common answers achieved through collective litigation.") (emphasis in original).

## CONCLUSION

Goplin fails to meet his burden of demonstrating that he is similarly situated to the proposed class members.  In the first instance, Goplin's allegations, when compared with WeConnect's policies, fail to demonstrate a violation of the FLSA.  WeConnect's policies indicated that technicians were required to keep equipment in their van, instructed to return to the territory office to restock equipment as frequent as needed, and were to record all hours worked. This is directly contrary to Goplin's self-serving declaration and testimony suggesting that the Madison FSMs directed or knew that he was storing equipment in his home and not receiving pay for loading or unloading equipment.  As such, the proposed class members were not subject to a companywide policy or decision.  Further, WeConnect's policies clearly provide different compensation for technicians, different circumstances of employment depending on whether the

25

individual is a "local" or "rural" technician, and the technicians themselves testified that they had different daily routines.  Likewise, the fact that every putative member has signed an arbitration agreement will require individual analysis of each arbitration agreement and compelling arbitration as it relates to those individuals. For the foregoing reasons, this Court should deny Plaintiff's Motion for Condition Certification.

Dated this 14th day of September, 2018.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
*Attorneys for Defendant, WeConnect, Inc.*

By:   *George Burnett*
George Burnett, State Bar No. 1005964
Kurt A. Goehre, Bar No. 1068003
Law Firm of Conway, Olejniczak & Jerry, S.C.
231 South Adams Street
P. O. Box 23200
Green Bay, WI  54305-3200
Telephone:  (920) 437-0476
Facsimile:   (920) 437-2868
E-mail:  gb@lcojlaw.com
            kag@lcojlaw.com

#2923187